[File No. 6127.]

JOHN MARSHALL, Respondent, v. WILLIAM E. HOCKING and Harry Hocking, Appellants.

(249 N. W. 111.)

Opinion filed May 13, 1933.   Rehearing denied June 24, 1933.

*Sinness & Duffy,* for appellants.

*F. T. Cuthbert,* for respondent.

CHRISTIANSON, J.   Plaintiff brought this action to recover the sum of $1623, claimed to be due him from the defendants for services performed as an architect.

The case was tried to a jury and resulted in a verdict for the plaintiff in the sum of $800.   Defendants moved for a new trial.   The

motion was denied and the defendants have appealed from the order denying a new trial.

The plaintiff is an architect residing at the city of Devils Lake in this state and carrying on business there. The defendants are also residents of Devils Lake and for a number of years have been operating a dental clinic in that city. In March, 1930, the defendants contemplated the construction of a business block, part of which was to be used for their dental clinic. The defendants presented the matter to the plaintiff and an arrangement was made whereby he was to prepare certain plans and specifications. This litigation grew out of these relations and the great question is as regards the terms of the agreement made between them at the time the plaintiff was engaged and authorized to prepare the plans and specifications.

In his complaint plaintiff alleges that during the month of March, 1930, the defendants employed him to draw plans and specifications and generally to perform all necessary work as an architect in and about the construction of a certain building in the city of Devils Lake; that in accordance with such employment he prepared the plans and specifications and thereafter, at the direction of the defendants, advertised for bids for the construction of the building; that bids were received and opened July 26, 1930; that after the bids had been received and opened the defendants, for reasons unknown to the plaintiff, declined and failed to build the building; that upon receipt of bids for the construction of the building the plaintiff, according to custom, had earned, and become entitled to payment of, compensation for the services performed; that the reasonable and customary fees for the services performed by the plaintiff is $1,623; that payment of such sum has been demanded and payment refused.

The defendants in their answer admit that the plaintiff is a licensed architect; they also admit

"That on or about March, 1930, the plaintiff and the defendants. entered into an agreement with reference to the preparation of plans. and the supervision of the construction of a building which the defendants proposed to erect, but in this connection allege that the agreement was as follows: That the plaintiff should prepare plans and specifications for a clinic building which could then be erected at a cost not to exceed Twenty Thousand Dollars, and should supervise the let-

ting of the bids for such building and should supervise the construction of such building, and that the defendants should pay the plaintiff therefor three and one-half per cent of the cost of such building." "That the plaintiff prepared certain plans and specifications, but in this connection allege that the same were not in accordance with the agreement theretofore made by the plaintiff and the defendants. Further allege that the plaintiff caused bids to be submitted for the erection of a building in accordance with the plans and specifications prepared by him, and that the best bids that could be secured for the erection of such building in accordance with such plans and specifications were in the aggregate amount of approximately Forty Thousand Dollars, or more than twice the maximum price for which such building was to be erected according to the understanding and agreement of the plaintiff and the defendants."

The only errors assigned on this appeal are based upon instructions given and refused. The first errors assigned are predicated upon the court's instructions relating to the right to recover the reasonable value where services are contracted for and performed and no compensation is fixed by agreement. The court charged that if the plaintiff and defendants had a conversation wherein the defendants employed the plaintiff to prepare the plans and specifications but no price set or fixed for such services, in such case the law would imply a liability to pay the reasonable value of the services so contracted for and performed. It is the claim of the defendants that this instruction was not justified under the evidence; that the evidence adduced shows that a fixed price was agreed upon and that, consequently, plaintiff was not entitled to recovery in quantum meruit; and that in any event without regard to the original conversation, there was evidence tending to show that before the services were actually performed and before any compensation had been earned, a definite price was fixed and agreed upon. An examination of the record leads us to the conclusion that these contentions are not well founded.

The defendant, William E. Hocking, being called for cross-examination under the statute, testified that he and the defendant Harry Hocking were partners; that about March, 1930, they were contemplating the construction of a business block in the city. He further testified:

"Q. And at that time you employed John Marshall to draw plans and specifications? A. We spoke to him about it. Q. You employed him, didn't you? A. Looks like it. Q. You can answer that yes or no. A. All right if that will help you any. Q. Well it will. And he drew plans and specifications and frequently consulted with you with reference to them, did he not? A. Yes, sir. Q. That building as contemplated by you, was to be a three story building, with basement? A. Yes, sir. Q. Facing on Fourth Avenue? A. Yes, sir. (Exhibit A marked by reporter.) Q. Doctor, I show you Exhibit A, consisting of two sheets of paper, what I take to be a rough sketch for the construction of a building, and ask you if you drew that and presented it to Mr. Marshall? A. Yes. Q. And that was a rough sketch giving Mr. Marshall an idea of the plan of the building which you contemplated erecting? A. Yes."

The plaintiff Marshall testified as regards the same conversation that he received the rough sketch from the defendant William E. Hocking and that the defendant then told him that he "would like" that the plaintiff prepare plans and specifications for the building. The plaintiff, also, testified that owing to the nature of the building it became necessary while the plans were being prepared, to have several conferences with the defendants and that many changes were made in the plans; that finally the plans were approved and advertisement made for bids for the construction. The plaintiff further testified:

"Q. At the time that you entered into this agreement and Mr. Hocking called you up and you agreed to go ahead about the building, was anything said to you about payment—as to what you were to receive? A. Nothing at all. Q. Did you ever have a talk with Wm. E. Hocking in regard to compensation? A. No. Q. Did you with Harry? A. Yes. Q. When did that take place? A. About three days after I had started on the plans Harry came to my office and asked what agreement I had made with Will. Q. Agreement with reference to compensation? A. Yes. I told him I had made no agreement with Will further than my regular fees. Q. Just what do you mean by that—'Regular fees'? A. Regular fees is five per cent; three and a half per cent for plans and specifications and one and a half per cent for superintendence. Q. That is during the course of the construction of the building? A. Yes. Q. Is that a standard agreed

upon by the architects of the state? A. Yes. Q. You have an association? A. Yes. Q. And there is an American Association I understand? A. Yes. Q. Is there compensation fixed at the same amount? A. No, they are one cent higher. Q. Than the North Dakota Association? A. Yes. Q. Now when is that three and a half per cent due according to the custom of architects of buildings? A. After the bids are opened. Q. And is figured on what? A. On the total cost of the building. Q. Of what? A. The lowest bid or the one that is accepted."

On his cross-examination the plaintiff testified:

"Q. You say you had this talk with Harry Hocking in regard to what you were going to charge as your commission? A. Yes. Q. Now will you tell us the whole conversation you had with Harry regarding this? A. Harry came up to my office and asked me what arrangements I had made with Will, and I said I hadn't made any arrangements, and he said 'What are you going to charge; I always want to know about those things' and I told him it would be five per cent—three and a half for the plans and specifications and one and a half for the superintendence and he said he could get it done in Minot for three per cent, and I told him that didn't matter; I couldn't do it, but I told him I wouldn't charge him anything for the general superintendence. Q. The three and a half then was going to cover not only the drawing for the plans and specifications but also the superintendence? A. I was going to do the superintending free, but I wouldn't do the plans and specifications for less."

The defendant Harry Hocking testifies regarding this conversation on direct examination:

"Q. Will you tell us what the conversation was with Mr. Marshall at that time? A. I asked him what commission he would charge. I told him that I always wanted to know about what it was going to cost and I asked him,—to superintend the building and draw plans. He told me the regular price was five per cent, but that he couldn't make it public as he was President of the Association but he would make it three and a half for the superintendence and drawing of the plans. He stated that definitely to me."

This evidence does not tend to establish that the parties had contracted for a fixed compensation for the services to be performed by

the plaintiff. The questions which the defendant Harry Hocking claims that he propounded to the plaintiff indicate that he assumed there had been no agreement as to the amount of compensation and was inquiring to ascertain what plaintiff would charge for his services. Harry Hocking was seeking to ascertain, as he says, "what commission he (Marshall) would charge." In short, what Harry Hocking was seeking to ascertain was not the compensation that had been agreed upon but what Marshall would ask for the services to be performed.

The next assignments of error are predicated upon the contention that when plaintiff was employed to prepare the plans and specifications it was upon his representation and with the understanding or agreement between the parties that the building should be and could be erected at the cost of not to exceed $20,000.

Defendants requested the following instruction:

"If an architect makes an estimate of the cost of a building he is not entitled to his fee unless the building can be constructed at a cost reasonably near that estimated. If you find that the plaintiff did inform the defendants that the building could be constructed at a cost of $20,-000 and that the defendants relied upon that estimate in employing the plaintiff, then the plaintiff can not recover if the building as contemplated by the parties at that time could not be constructed for approximately that figure."

The request was denied. It is the contention of the appellant that the court erred in refusing to give this instruction.

As indicated, there is a conflict in the evidence as regards the terms of the agreement between the plaintiff and the defendants. Some of the testimony is set forth above. As regards the particular question under consideration here we quote from the testimony:

The plaintiff Marshall testified:

"Q. At the time you first had this talk with Dr. Will Hocking, and he gave you this sketch showing what he had in mind, I presume he told you what the purpose of the building was? A. Yes. Q. It was to be a Dental Clinic? A. Yes. . . . Q. At that time, was there anything said as to the probable cost of the building? A. No, not at that time. Q. Nothing said at that time? A. No. Q. And do I understand that you then went ahead with a preliminary sketch? A. Yes. Q. And at some time during the process, was there something

said about the probable cost of the building? A. There was one night when I was up talking with Dr. Will Hocking and his wife. He asked me about the probable cost of the building and I told him—By the Court: When was that? A. After I had the plans all made except the Third Floor. I called at his apartments there—he asked me about the probable cost of the building; I told him I couldn't tell him the probable cost on account of I didn't know what was going to be used in the building, and I told him I could guess, and told him that the plain structure—building without decorating or heating or plumbing would cost about $20,000. Q. That the building without the heating or plumbing would cost about $20,000? A. The plain structure, yes. Q. And wasn't there some talk about the time when you first started drawing the plans, that you estimated to Dr. Hocking that the building could be erected complete for approximately $20,000? A. Never anything said. That was the only time there was anything said about the probable cost of the building. . . . Q. When you spoke to Mr. Marshall about saying that you could guess at $20,000 for a plain structure, what did you mean? A. I said it would be a guess—just the plain structure would be about $20,000."

The defendant William E. Hocking testified:

"Q. Now will you tell us what the first conversation you had with Mr. Marshall with reference to this and where it occurred? A. I met Mr. Marshall one day and I asked him about constructing—Q. Tell us where it took place. A. As near as I can recall it was in my office. (Former answer continued) constructing a dental clinic across the street. I said we wanted a three story building and I wanted to know what it would cost. 'I will make a rough sketch of it and I will let you know,' he said. He came up to the house when my brother was there and my wife, and we asked him what would be the cost since he had had such experience in building, and he said we should be able to put up that building for $20,000. That would be complete without the dental equipment. I said you know the dental equipment comes to a lot besides that."

The defendant William E. Hocking further testified that in subsequent conversations relating to material to be used in the building, Marshall stated that the use of the material proposed would only slightly increase the cost of the building and that when the plans were

finally submitted by Marshall he (Hocking) was still laboring under the impression that the building would cost something like $20,000.

The defendant Harry Hocking testified that shortly after he had the conversation with the plaintiff relating to what he would charge for his services he (Harry Hocking) was present in the defendant William E. Hocking's apartment; that Marshall was present and that a conversation was had with reference to the costs of the building. As regards the conversation then had he testified:

"Q. Will you tell us what the conversation was then with reference to that? A. Well we put the proposition up to him as to what it would cost us to build such a building and he told us it would be about $20,000. That was to be a fire proof building and complete in every detail, around $20,000. Q. A fire proof building complete in every detail, around $20,000? A. Yes. Q. Now during the progress of these plans, did he at any time suggest to you that by reason of any changes or different material or anything of that kind that the cost of erection of that building would be in excess of $20,000 or in the neighborhood of forty-five or forty-seven thousand dollars? A. No, he never mentioned forty-five or fifty thousand but he said it might go in excess of that if we would accept it with all the trimmings. Q. Did he make any estimate of what it would be? A. No, I don't think he definitely stated. Q. What was said with reference to how you would handle the matter? A. He said 'Let's get these out for bids.' 'We don't need to accept them at all; we can get the bids on the various materials and then we can pare it down to suit our pocket book to where we can afford to build it' and that was the understanding about the bids when I left."

When bids were received pursuant to advertisement they totaled to exceed $47,000 the lowest bid for the general contract being $33,427. There is a conflict in the testimony as to what took place after the amount of the bids was ascertained. The plaintiff testified:

"Q. When these bids were opened they told you that they weren't going to build on account of those plans or on account of the cost being so far in excess of what they planned, did they not? A. No, at the time the bids were opened, Will wanted time to think it over, and I went down that was several days afterwards and asked if he had decided and he said it was too high. Q. That the cost of the building was

too high? A. I told him I could reduce it considerable. Q. But you never did revise those plans? A. Well I went over a lot of the material and of course changed a lot of it, and Harry told me that he wouldn't make any changes; that he wanted the building that way—that was the way they wanted the building. Q. When did Harry tell you that? A. In my office about a day or so after the bids were opened."

The defendant Wm. E. Hocking testified:

"Q. After the bids were opened, did you have any talk with Mr. Marshall with reference to the erection of the building? A. When the bids were opened that day Mr. Marshall said 'What are you going to do?' 'After I recover from the shock I will talk to you about it' I said, and I went back to work. Q. And have you had any further talk? A. Once later he said 'What about the building?' I said 'It is out of the question' and once this year he said 'We could do the building for forty per cent less' Then I said 'You would have done us for forty per cent more last year.'"

The defendant Harry Hocking testified:

"Q. And after the bids were opened and they totaled up something like $47,000, did you and your brother decide not to erect that? A. No, we were waiting for the paring down; we never made any decision. Q. Did Mr. Marshall ever come to you and suggest where the plans and specifications could be cut down or reduced so as to pare this project within—A. No, sir, he never did. Q. He has at no time suggested any plans or specifications or changes which would bring the cost down anywhere near—A. No sir. Q. You were not in the court room at the time Mr. Marshall was giving his testimony? A. No. Q. Mr. Marshall said after the bids were opened, he suggested making some changes and cutting down on the cost, and that you told him you didn't want to make any changes; that you wanted all of these materials in it. A. Never such a conversation and my conversation always has been that we would pare it down as much as possible everywhere."

As this testimony indicates, the building was never constructed.

It will be noted there was a square conflict in the testimony as to whether anything was said about the cost of the proposed building at the time the plaintiff was employed by the defendants to prepare the plans and specifications. The plaintiff denied that anything was said

regarding the cost of the proposed building. While the defendants differed somewhat as to what was said they testified in effect that the plaintiff stated that they should be able to construct the proposed building for about $20,000. Neither of the defendants testified that they relied upon the representations made by the plaintiff as to the cost. As said the defendants admitted that they had entered into a contract with the plaintiff to prepare plans and specifications for a certain building and they admitted that he prepared certain plans and specifications but they alleged that the plans and specifications were not in accord with the contract; but the only particular in which they claim that the plans and specifications failed to comply with the contract is that the building could not be constructed for about $20,000. In short, if the building could have been constructed for something near $20,000, then, the plans and specifications would have been in accord with the contract. Hence the great issue in the case was what were the terms of the contract between the parties and that in turn resolved itself into a question of credibility of witnesses, that is, whether the plaintiff or the defendants told the truth as regards the conversation had when the contract was made. In its instructions to the jury the trial court outlined the issues in the case, and specifically stated the contention of the defendants that the agreement between the parties was that the plaintiff should prepare plans and specifications for a building that could be erected at a cost of not to exceed $20,000; that he should supervise the construction of the building and that the defendants should pay him for such services three and one-half per cent of the cost of the building; that the plans and specifications prepared by the plaintiff were not in accord with the agreement; that the best bids that could be secured for the erection of the building exceeded $40,000.

The court further instructed the jury:

"It is claimed as I read from their answer that the agreement was 'That the plaintiff should prepare plans and specifications for a clinic building which could then be erected at a cost not to exceed Twenty Thousand Dollars.' They make no claim that plaintiff in this case guaranteed to erect a building for any such sum but they claim that he was to prepare plans and specifications for a building which was not to exceed $20,000, supervise the letting of bids, the construction and so on.

556

"Now if the contract was oral and no price fixed as claimed by the plaintiff, then he is entitled to recover the reasonable value of such services.

"If the conversation between the plaintiff and defendant was at a later date as to the three and a half per cent, if the contract had already been made, if the contract was originally made, they were bound by the original contract unless modified or a new contract made by reason of the second conversation.

"In this case, of course, the plaintiff denies that he ever had the conversation or made any agreement or there was any understanding that he was to prepare plans and specifications for a building which was to cost $20,000; he admits there was some conversation with reference to a $20,000 building but that was at a much later date.

"It is for you to say what the evidence is; what the facts are."

While the instructions might have been more complete the court nevertheless did fully outline the issues, and the contentions of the defendants were stated with particularity. The issues in the case were narrow. The basic question was one of veracity, that is, was the contract the one claimed by the plaintiff? It is inconceivable that the jury could have returned a verdict in favor of the plaintiff if they had disbelieved the plaintiff, or if they had believed the testimony of the defendants as to the agreement which they claimed was made. In short, if the jury had believed that the agreement was that the plaintiff was to prepare plans and specifications for a building that should cost approximately $20,000, they certainly would not have returned the verdict for the plaintiff in this case. The instruction requested by the defendants, however, did not adhere to the theory on which the defendants predicated their defense. That theory as set forth in their answer and as sought to be established by their evidence was that the plaintiff was employed to prepare plans and specifications for a building that could be constructed at a cost of not to exceed $20,000, that is, the theory of the defendants was that the cost of the building was an essential element of the plans and specifications which the plaintiff was employed to prepare. The defendants in their answer admit the employment and the preparation of plans and specifications but assert that the plans and specifications were not in accordance with the agreement between the parties. As said, the sole particular in which it is claimed that the

plans and specifications did not conform to the contract is as regards the cost of the building. The instruction requested is not based upon the theory that the cost of the building was an essential part of the contract but it is predicated rather upon the theory that the architect, by means of a false estimate as to the cost of the proposed building, induced the defendants to employ the plaintiff to prepare the plans and specifications. In the circumstances we are of the opinion that the trial court did not err in refusing to give the requested instruction.

We are, also, of the opinion that in light of the issues, the proofs and the instructions, it is inconceivable that the jury could have returned a verdict for the plaintiff unless they found his version of the contract of employment to be the true one.

The order appealed from is affirmed.

NUESSLE, Ch. J., and BURR, BIRDZELL and BURKE, JJ., concur.